Filed 5/6/22  P. v. Eddowes CA5
Opinion following transfer from Supreme Court

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>CAVIN LEE EDDOWES,<br><br>    Defendant and Appellant. | F079674<br><br>(Super. Ct. No. BF170034A)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County.  Kenneth C. Twisselman II, Judge.

William J. Capriola, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Amanda D. Cary and Lewis A. Martinez, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant Cavin Lee Eddowes sexually assaulted a woman and then obstructed and threatened to kill the deputy sheriff transporting him after his arrest. A jury convicted defendant of assault with intent to commit rape by force, false imprisonment with violence, attempted criminal threat, and misdemeanor obstruction or resisting a peace officer. The trial court sentenced defendant to a total term of six years in prison.

Defendant contended on appeal that (1) we should reverse his conviction for attempted criminal threat because the trial court failed to instruct the jury that the intended threat must have been sufficient to cause sustained fear in a reasonable person, (2) we should strike a $30 criminal conviction assessment the trial court did not orally pronounce at sentencing from the abstract of judgment, and (3) we should order the trial court to amend the sentencing minute order and abstract of judgment to reflect the components of the $930 penalty assessment. We remanded with directions to the trial court to set forth the components of the penalty assessment in the minutes and the abstract of judgment and affirmed in all other respects.

Defendant petitioned for Supreme Court review, reasserting his challenges to his conviction and asserting he was entitled to remand for resentencing pursuant to new sentencing provisions. The Supreme Court granted review and transferred the case to this court with directions to vacate our decision and reconsider the cause in light of Senate Bill No. 567 (2021–2022 Reg. Sess.), Assembly Bill No. 518 (2021–2022 Reg. Sess.), and Senate Bill No. 317 (2021–2022 Reg. Sess.). Having done so, we once again reject defendant's contentions but remand the matter to permit the trial court to exercise its newfound sentencing discretion.

## PROCEDURAL BACKGROUND

Defendant was originally charged by complaint on October 19, 2017. Prior to defendant's preliminary hearing, on November 28, 2017, defense counsel raised a doubt as to defendant's competency pursuant to Penal Code section 1368.[1] The trial court

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

2.

found defendant incompetent to stand trial and committed him to the State Department of State Hospitals on January 23, 2018. Defendant was found competent to stand trial on January 9, 2019. Defendant waived his right to a preliminary hearing and the court held him to answer on January 22, 2019.

On January 23, 2019, the Kern County District Attorney filed an information charging defendant with assault to commit sexual intercourse by force (§§ 220, 261, subd. (a)(2); count 1), false imprisonment by violence, menace, fraud, or deceit (§§ 236, 237, subd. (a); count 2), attempted criminal threat (§§ 664, 422; count 3), and misdemeanor resisting a peace officer (§ 148, subd. (a)(1); count 4). Defendant pled not guilty to all charges in the information.

After a seven-day trial, the jury convicted defendant of all charges on June 24, 2019.

On July 23, 2019, the court denied probation and sentenced defendant to prison for six years as to count 1, three years stayed (former § 654) as to count 2, 18 months as to count 3 (concurrent to count 1), and one year as to count 4 (concurrent to count 3). In addition, the trial court ordered that the defendant pay a $300 fine (§ 290.3) and a $930 penalty assessment (as calculated in the probation officer's report) as to count 1; a $300 restitution fine and a $300 parole revocation restitution fine (§§ 1202.4, 1202.45) as to count 3; victim restitution (§ 1202.4, subd. (f)) as to counts 1 and 3;[2] and $30 criminal conviction assessments (Gov. Code, § 70373) and $40 court operations assessments (§ 1465.8) as to each count.

Defendant timely appealed on July 25, 2019.

## FACTS

Jane Doe arranged to meet Michael Phillips in Standard Park (the park) in Bakersfield, California on October 17, 2017, at approximately 11:00 a.m. Doe had come

---

[2] The court ordered probation to determine the amount of restitution and that it be paid to the confidential victim and to the Restitution Fund in the State Treasury.

to Bakersfield to visit her mother for a few days. Although she had never met Phillips before, Phillips had previously dated the sister of Doe's former boyfriend. When Phillips arrived at the park, defendant was accompanying him. Doe had not met defendant before. They sat near the bathrooms and, after approximately 30 minutes, Phillips left to get something to eat. At one point, Doe tried to contact Phillips to see how long he would be gone.

Defendant sat approximately three feet away from her and they engaged in small talk. During the conversation, defendant complimented her legs and repeatedly asked her to go into the bathroom. Doe thought this was strange and refused to go. Defendant asked her to accompany him into the bathroom approximately seven more times, explaining that he had something he wanted to show her. He laid on the ground and asked Doe to cuddle with him. Doe declined. Defendant commented that the park was empty and then lunged forward while grabbing Doe's wrists and sitting on her. Defendant held Doe's wrists with both hands, said he would be getting "some pussy," and told her to sit there. Defendant thrusted his crotch at her and, holding her wrist with one hand, reached for her shorts.

Doe struggled and screamed and a man in a white truck yelled at defendant to get off her. Defendant then got up and told Doe that she would not "get away with this" before running off. The man in the white truck and a woman gave her some water and called the police. The police arrived five minutes later. An officer drove Doe to the location where defendant had been detained. Doe identified defendant as her assailant based upon his missing front teeth that day. She also positively identified defendant as her assailant while testifying during defendant's trial. Doe testified that she did not want to have sex with defendant and believed defendant intended to rape her.

Richard Timmermans testified that he was eating lunch in his truck at the park on October 17, 2017, when he heard screaming. Timmermans saw defendant using one hand to hold Doe's hands and the other hand to pull her pants down. Timmermans yelled

4.

at defendant and called 911. Another woman was walking on the sidewalk and went to help Doe. Both women walked to Timmerman's truck while he finished speaking with the 911 dispatcher.

When defendant left the scene, Timmermans followed him with his truck. Timmermans contacted 911 once from the park where he saw Doe and again from an alley where he had followed defendant. Timmermans identified defendant to the police as the assailant.

Deputy Amanda Plugge responded to the 911 call and contacted defendant in the alley located one block from the park. Timmermans flagged her down and identified defendant as Doe's assailant. While Plugge detained defendant, Deputy Raymundo Martinez arrived with Doe to identify defendant. Plugge placed defendant into her patrol car to transport him to jail. While waiting to turn out of the alley, defendant slammed his forehead into the barrier separating the front and back seats and split open his forehead. He then flipped himself and started kicking the back door.

Deputy Martinez testified that he responded to the park and met with Doe who he then escorted to identify defendant. Martinez was still in the alley when defendant headbutted the seat barrier and assisted in restraining defendant until other officers arrived. After transporting Doe home, Martinez returned to the alley where defendant was being transferred to an ambulance. Martinez followed the ambulance to the hospital. After defendant had received treatment, Martinez contacted defendant to transport him to the jail. Martinez told defendant that they were leaving the hospital and tugged on defendant's arm. Defendant started screaming that he would not leave and stated, "I'm not going to fucking jail. You are going to have to fight me." Defendant started kicking him and Martinez asked security staff to restrain defendant while he obtained a restraint from his patrol vehicle. When he returned, Martinez told defendant to stop resisting, but defendant refused to obey. Defendant kicked and struggled for approximately 10 minutes before Martinez was able to hobble defendant's legs to the hospital gurney. Still not able

5.

to control defendant, Martinez used the gurney to transport defendant to the patrol car. Defendant was eventually restrained by the efforts of Martinez, another deputy, and two hospital security guards.

Defendant continued to resist Martinez even after being placed in the patrol car. Defendant kicked the doors of the patrol vehicle and headbutted the glass partition several times. Martinez retrieved an additional restraint and tied defendant's hands to the floor of the vehicle to prevent him from hitting his head. While traveling to the jail, defendant threatened to kill Martinez and said, "I will fucking kill you when I get out of jail, motherfucker. You will see, you fucking pig. I will get out soon. I will fucking kill you. You better watch your back, motherfucker."

Martinez testified that he believed defendant's threats to kill him and was in actual fear as a result. Martinez further believed that defendant intended to carry out his threats whether Martinez was on patrol or off work because defendant had behaved violently during the initial contact, transportation to the hospital, and at the hospital. Because defendant "had no care for himself," Martinez "felt that [defendant] would do the same to [Martinez] or worse." Martinez testified that although he had been threatened previously, defendant's threats caused him to be in sustained fear because he knew that defendant might be released from custody, their community was small, and Martinez previously ran into suspects he had arrested in their community. Martinez stated that defendant "really stuck out" in his mind and he was concerned that he might encounter defendant one day on the street. Despite defendant's threats, Martinez did not request a change in his patrol area or a change in his shift. Martinez testified that while he had items that he could use to defend himself, those items were not always available when he was off duty.

Defendant testified he and Doe had been dating for several months, initially testifying they met in December 2016, but then later testifying they met in October 2017. At first, defendant testified he met Doe at his aunt's house and they got together four or five times thereafter. Defendant later testified he met Doe once at his aunt's house for

coffee and two additional times at the park. Defendant later testified that he had met Doe only once before the day of the incident in the park, and Doe said she wanted to be his girlfriend. Defendant testified that he was in the park with Doe when she began "wigging out, like trippin." She demanded money from defendant and fought and scratched him. Defendant grabbed her wrists and told her to stop trying to hit him. He tried to walk away from Doe. She yelled at him and told him to let go of her hands or she would call the cops. He then walked away. Defendant testified that after his arrest, he told Deputy Plugge that he did not know Doe but testified that he made that statement to the officer because he was nervous and did not want to go to jail.

## DISCUSSION

**I.** *The trial court's failure to instruct the jury as to an element of attempted criminal threat was harmless beyond a reasonable doubt.*

Defendant contends he was denied his rights to due process and a fair trial because the trial court failed to instruct the jury that it must find defendant's intended threat was sufficient to cause sustained fear in a reasonable person. The People concede instructional error but argue the error was harmless as any reasonable juror would have concluded that the intended threat would cause sustained fear in a reasonable person. We agree with the People.

### A. Background

The trial court instructed the jury that for the crime of attempted criminal threat, "the People must prove that, one, the defendant took a direct but ineffective step toward committing a criminal threat and, two, the defendant intended to commit a criminal threat." The trial court further instructed:

> "To decide whether the defendant intended to commit a criminal threat, please refer to the separate instructions that I will give you on that crime.· The defendant may be guilty of attempt even if you conclude that a criminal threat was actually completed.

7.

"A criminal threat is a violation of Penal Code Section 422. To prove that a defendant is guilty of this crime, the People must prove that [1] the defendant willfully threatened to unlawfully kill or unlawfully cause great bodily injury to Deputy Martinez; [2] the defendant made the threat orally; [3] the defendant intended that his statement be understood as a threat and intended that it be communicated to Deputy Martinez; [4] the threat was so clear, immediate, unconditional, and specific that it communicated to Deputy Martinez a serious intention and the immediate prospect that the threat would be carried out; [5] the threat actually caused Deputy Martinez to be in sustained fear for his own safety; and, [6] Deputy Martinez's fear was reasonable under the circumstances."

In closing, the prosecutor argued that, although the crime was charged as an attempt, defendant completed the crime. Defendant put into action his plan to criminally threaten Deputy Martinez when defendant verbally said that he would kill Martinez, intended to kill Martinez, and intended to communicate to Martinez that he would kill him. The prosecutor told the jury that the threat was, on its face, an unambiguous threat to kill Martinez when defendant was released from jail. The prosecutor also argued that the threat was so clear, immediate, unconditional, and specific that it communicated to Deputy Martinez that defendant intended to kill him. Martinez testified that he was in sustained fear for his safety and, the prosecutor argued, Martinez's "fear was reasonable under the circumstances." The prosecutor told the jury that all the elements of a criminal threat had been met and that defendant was guilty of attempted criminal threat even if the jury concluded the crime had been completed. The prosecutor also told the jury that the crime was charged as an attempt should the jury conclude the threats did not actually cause Martinez to suffer sustained fear.

During closing argument, defense counsel argued that Martinez was not in sustained fear because (1) he wrote in his report that he was just in "fear" and not sustained fear; (2) Martinez was armed with a radio, gun, and baton; (3) Martinez knew that people get upset when they are being taken to jail; (4) defendant was restrained to the floor of the vehicle when he made the threats; and (5) Martinez did not take any steps that showed he was actually concerned for his safety. Defense counsel also argued that

8.

defendant did not threaten "immediate" harm because defendant said he would kill Martinez when he was released from jail.

### B.     *Law and Standard of Review*

The law of criminal attempt applies to the offense of criminal threat (*People v. Toledo* (2001) 26 Cal.4th 221, 229–231) so that "under California law, there is a crime of attempted criminal threat" (*id*. at p. 235). *Toledo* explained the crime of attempted criminal threat encompasses situations where a defendant intends to commit a criminal threat "but is thwarted from completing the crime by some fortuity or unanticipated event." (*Id*. at p. 232.) An incomplete criminal threat includes scenarios where a defendant acts with the requisite intent but (1) a written threat is intercepted before delivery to the threatened person, (2) the victim does not understand the defendant's oral threat, or (3) the threat does not actually cause the threatened person to be in sustained fear for his or her safety even though, under the circumstances, that person reasonably could have been placed in such fear. (*Id*. at p. 231.)

*Toledo* described the intent required for an attempted criminal threat as a specific intent "to threaten to commit a crime resulting in death or great bodily injury with the further intent that the threat be taken as a threat, under circumstances sufficient to convey to the person threatened a gravity of purpose and an immediate prospect of execution so as to reasonably cause the person to be in sustained fear for his or her own safety or for his or her family's safety." (*People v. Toledo*, *supra*, 26 Cal.4th at pp. 230–231.) To avoid substantial First Amendment concerns associated with criminalizing speech, the offense of attempted criminal threat requires proof that the defendant had a subjective intent to threaten and that the intended threat under the circumstances was sufficient to cause a reasonable person to be in sustained fear. (*People v. Chandler* (2014) 60 Cal.4th 508, 525 (*Chandler*).) "Accordingly, when a defendant is charged with attempted criminal threat, the jury must be instructed that the offense requires not only that the

9.

defendant have an intent to threaten but also that the intended threat be sufficient under the circumstances to cause a reasonable person to be in sustained fear." (*Ibid*.)

Where the trial court fails to instruct the jury as to an element of the offense, we reverse unless any error was harmless beyond a reasonable doubt. (*Chandler*, *supra*, 60 Cal.4th at p. 525, citing *Neder v. United States* (1999) 527 U.S. 1, 8–15 [applying harmless-error test for federal constitutional error—whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained— to trial court's failure to instruct on an element of a crime]; *Chapman v. California* (1967) 386 U.S. 18, partially overruled by *Brecht v. Abrahamson* (1993) 507 U.S. 619, 622–623 [holding that the standard "harmless beyond a reasonable doubt" is not applicable in habeas cases].)

### *C.    Analysis*

The People charged defendant in count 3 with attempted criminal threat. The court instructed the jury with CALCRIM No. 460 on the crime of making an attempted criminal threat. However, when the crime is attempted criminal threat, the court must add a third element, namely, that the jury must also determine if the intended criminal "threat [was] sufficient under the circumstances to cause a reasonable person to be in sustained fear." (*Chandler*, *supra*, 60 Cal.4th at p. 525; see Use Note to CALCRIM No. 460 (Feb. 2015 rev.) p. 246; Use Note to CALCRIM No. 1300 (Mar. 2018 rev.) pp. 1140–1141.) Here, the court failed to instruct as to the third element that required the jury to find the threat was sufficient to place a reasonable person in sustained fear. However, we conclude that the error was harmless beyond a reasonable doubt.

An instruction that omits an element of an offense is reversible error unless the error is harmless beyond a reasonable doubt. (*Chandler*, *supra*, 60 Cal.4th at p. 525.) In only a "narrow class of cases" will omitting an element be harmless beyond a reasonable doubt. (*Neder v. United States*, *supra*, 527 U.S. at p. 17, fn. 2.) In making that determination, we ask whether "defendant's threats were sufficient under the

10.

circumstances to cause a reasonable person to be in sustained fear" and whether a "reasonable juror could have concluded otherwise." (*Chandler*, at p. 526.) "[I]nstructional error is harmless [beyond a reasonable doubt] 'where a reviewing court concludes beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence.' " (*People v. Mil* (2012) 53 Cal.4th 400, 417.)

In *Chandler*, the defendant lived around the corner from the first victim. (*Chandler*, *supra*, 60 Cal.4th at p. 511.) In several incidents, occurring over several weeks, the defendant called the first victim profane names, reminded her that she lived alone, and threw tennis balls and pipes at her window. During one incident, the defendant walked up the first victim's street and said, " ' "Fuck you, bitch. I'm going to kill you." ' " Later, defendant sang, " 'somebody's watching me' " outside the second victim's residence where the first victim had taken refuge. (*Id.* at pp. 511–512.) The following day, the defendant approached the first victim and said, " 'I'm going to kill you bitch.' " (*Id.* at p. 512.) The defendant also threatened the second victim one night when he was outside her home swinging a golf club and said, " ' "I'm going to kill you, you fucking bitch." ' " (*Ibid.*)

The *Chandler* court concluded that no reasonable juror could have failed to find the defendant's threats sufficient under the circumstances to cause a reasonable person to be in sustained fear and found any error in failing to instruct the jury on the objective nature of the threat to be harmless beyond a reasonable doubt. (*Chandler*, *supra*, 60 Cal.4th at p. 525.) In so doing, *Chandler* relied upon the following factors: (1) neither the prosecution nor the defense suggested that the defendant could be convicted of attempted criminal threat based solely on his subjective intent to threaten; (2) the evidence did not suggest that the jury convicted on that basis since the defendant expressly threatened to kill both victims; and (3) the defense theory at trial did not contest the reasonableness of the victims' fear, but rather argued that there was reasonable doubt

11.

that the threats had been made and, if made, that the victims did not suffer actual or sustained fear. (*Ibid.*)

In the instant case, while traveling to the jail, defendant threatened to kill Martinez and said, "I will fucking kill you when I get out of jail, motherfucker. You will see, you fucking pig. I will get out soon. I will fucking kill you. You better watch your back, motherfucker." Upon reviewing the record, we rely on *Chandler* and conclude that no reasonable juror could have failed to find defendant's threats sufficient under the circumstances to cause a reasonable person to be in sustained fear and thus, any error is harmless.

We first note that, as in *Chandler*, neither the prosecution nor the defense ever suggested that defendant could be convicted of attempted criminal threat based solely on his subjective intent to threaten. The prosecutor argued that defendant completed the crime of criminal threat because defendant had uttered an explicit threat that communicated to Martinez the serious intent and immediate prospect that defendant would carry it out. The prosecutor further pointed out that Martinez was in sustained fear for his safety and his fear was reasonable under the circumstances. The prosecutor explained to the jury that they could convict defendant of attempt even though he completed the crime. The prosecutor further explained that if the jury reasonably doubted that Martinez was in sustained and actual fear because of defendant's threats, defendant was guilty of attempted criminal threat.

Furthermore, the evidence does not suggest that the jury convicted defendant based solely on his subjective intent to threaten since defendant voiced his express and unambiguous threat to kill Martinez. *Chandler* similarly relied upon the unambiguous words of the threat to conclude that the jury relied upon more than that defendant's subjective intent in convicting. (*Chandler*, *supra*, 60 Cal.4th at p. 525.)

Moreover, like *Chandler*, the defense theory at trial did not contest the reasonableness of Martinez's fear but argued reasonable doubt as to whether the threat

12.

actually caused Martinez to be afraid. For example, defense counsel argued in closing that Martinez did not describe his fear as "sustained" in his original report (writing only that he experienced fear) and failed to take proactive steps to protect himself after the threat. In addition, counsel disputed that Martinez experienced fear because Martinez acknowledged that suspects are commonly upset at being arrested, he himself was armed, and he was protected from defendant by the patrol car's front seat divider and defendant's restraints. Counsel then argued that defendant's threats spoke to his future action and, therefore, did not demonstrate an immediate prospect of being carried out. Defense counsel did not argue or present any evidence showing that the "intended [criminal] threat [was] [in]sufficient under the circumstances to cause a reasonable person to be in sustained fear." (*Chandler*, *supra*, 60 Cal.4th at p. 525; see CALCRIM No. 460.)

Overwhelming evidence also showed that defendant's threats to kill Martinez would have caused a reasonable person in his position to be in sustained fear. Martinez knew that defendant had already physically assaulted and attempted to rape the victim in a public park in broad daylight. The jury convicted defendant of that offense. Martinez also knew that defendant had violently resisted transportation to jail by deliberately slamming his head into the patrol car divider and continuing to kick the interior despite having split his head open and bleeding profusely. Martinez participated in a 10-to-15-minute struggle with defendant that required Martinez, another deputy, and two security guards to restrain defendant. After being placed in the patrol car, defendant continued to hit his injured head against the divider and kick the patrol car until finally Martinez restrained him to the floor of the vehicle.

Martinez testified that while he had previously received threats to his safety from other suspects, he believed defendant seriously intended to execute the threats and was in actual and sustained fear as a result. Martinez's belief that defendant intended to kill him when he was released from custody is supported by defendant's violence in attacking the victim and resisting arrest. Defendant's actions exhibited a lack of care for himself that

13.

justified Martinez's belief that if defendant "had no care for himself," "that [defendant] would do the same to [Martinez] or worse." Martinez's experience in encountering prior suspects in their community and the size of their community added to the likeliness of defendant carrying out the threat.

Defendant argues that Martinez was not actually in sustained fear from defendant because Martinez had weapons to protect himself. However, police officers are injured and killed despite the weapons they carry, and a reasonable person would still be in sustained fear of injury from someone who has threated to kill them, even if they might be able to defend themselves if the circumstances should permit. While defendant was restrained when he made his threat, a reasonable person would not discount a threat to be killed made by someone in custody when the threat specifically states that the threat will be acted upon when the individual is released. Defendant argues that Martinez did not change his patrol area or shift, but the evidence did not show that defendant was ever released from custody necessitating such precautions.

Defendant relies on *People v. Jackson* (2009) 178 Cal.App.4th 590 (*Jackson*) to contend that the court's instructional error prejudiced him. In *Jackson*, the victims attempted to retrieve a key to their rental residence and discovered the defendant trespassing there. (*Id*. at p. 594.) While the defendant initially vacated the residence, he became agitated and said something about " 'blow[ing] [their] heads off' and 'chop[ping] [their] heads off' " and referred to a rifle. (*Ibid*.) The victims called the police from inside the residence and the defendant sat outside. (*Id*. at pp. 594–595.) The jury convicted the defendant of attempted criminal threat but had not been instructed to find that the defendant's intended threat must have been sufficient to reasonably cause the person to suffer sustained fear. (*Id*. at p. 595.) The court found that the failure to instruct on the element was not harmless. (*Id*. at p. 600.)

*Chandler* reviewed *Jackson* and distinguished it. (*Chandler*, *supra*, 60 Cal.4th at p. 526.) *Chandler* noted that in *Jackson* the victims were inside the residence when the

defendant threatened to blow and chop their heads off. (*Ibid.*, citing *Jackson*, *supra*, 178 Cal.App.4th at p. 594.) In reversing the conviction, *Jackson* reasoned that "the jury might have concluded, since [the victims] were safely inside the house with a telephone to call the police while defendant sat out front, or since defendant's threats were so outlandish, that defendant's statements could not reasonably have caused the victims to suffer sustained fear." (*Jackson*, at p. 600.) "[In *Chandler*], by contrast, [the victims] testified that [the] defendant, a neighbor, made explicit threats that he was going to kill each of them, and [the] defendant made the threats while face-to-face with the victims (and, in [one victim's case], while swinging a golf club) on the street where the victims lived. [¶] In sum, [the] defendant's threats were sufficient under the circumstances to cause a reasonable person to be in sustained fear—indeed, [the] defendant did not argue otherwise at trial—and no reasonable juror could have concluded otherwise." (*Chandler*, at p. 526.)

The instant case is more like *Chandler* than *Jackson*. Like the defendant in *Chandler*, defendant explicitly and unambiguously threatened to kill Martinez. In contrast to *Jackson*, the evidence here did not permit the jury to find that defendant's threats to kill Martinez when freed from custody were, under the circumstances, so outlandish or unreasonable that they were insufficient to cause a reasonable person in Martinez's position to be in sustained fear.

Defendant also threatened Martinez face-to-face. Although defendant was restrained, this did not lessen the impact of a threat that, by its terms, would only occur once defendant was no longer in custody. As in *Chandler*, defense counsel did not argue that defendant's threats were not sufficient under the circumstances to cause a reasonable person to be in sustained fear. Instead, like the defense counsel in *Chandler*, counsel here argued that there was reasonable doubt as to whether Martinez was credible when he testified that he suffered actual and sustained fear, and counsel challenged the immediate nature of the threat.

For these reasons, we conclude defendant's "threats were sufficient under the circumstances to cause a reasonable person to be in sustained fear … and no reasonable juror could have concluded otherwise." (*Chandler*, *supra*, 60 Cal.4th at p. 526.) Thus, in accord with *Chandler*, we conclude that the trial court's instructional error was harmless beyond a reasonable doubt.

## II. The effect of new sentencing legislation.

### A. Sections 654 and 1170

#### 1. Background

The court denied probation and sentenced defendant to prison for six years as to count 1 and three years stayed pursuant to former section 654 as to count 2. When sentencing defendant to the upper term of six years as to count 1, the trial court cited the aggravating circumstances contained within the probation officer's report.[3]

At the time of defendant's sentencing, former section 654, subdivision (a) required the trial court to punish defendant in accordance with the provision that provided for the longest potential term of imprisonment. The statute "expressly prohibits separate punishment for two crimes based on the same act, but has been interpreted to also preclude multiple punishment for two or more crimes occurring within the same course of conduct pursuant to a single intent." (*People v. Vargas* (2014) 59 Cal.4th 635, 642; accord, *People v. Harrison* (1989) 48 Cal.3d 321, 335.) Effective January 1, 2022, Assembly Bill No. 518 (2021–2022 Reg. Sess.) amended section 654 to provide the trial court with the discretion to choose the count for which it will impose punishment. (Stats. 2021, ch. 441, § 1.) Here, the trial court imposed sentence on the count that provided for the longest term of punishment.

---

[3] The aggravating circumstances identified in the probation officer's report included defendant's numerous convictions as an adult, that he was on four grants of probation at the time of the offense, his unsatisfactory performance on misdemeanor probation, and that he had an outstanding warrant at the time this offense.

Additionally, effective January 1, 2022, Senate Bill No. 567 (2021–2022 Reg. Sess.) amended section 1170 in one respect relevant here. A court must "order imposition of a sentence not to exceed the middle term," except under narrow circumstances. (§ 1170, subd. (b)(1), as amended by Stats. 2021, ch. 731, § 1.3.) An upper term may be imposed when justified by aggravating circumstances and the facts underlying those circumstances have been stipulated to by the defendant or found true by a jury or by the judge in a court trial. (*Id*., subd. (b)(2).) Here, defendant was sentenced to the upper term on count 1 based, in part, on "facts … [not] stipulated to by the defendant, or … found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial," as required under the amended statute. (§ 1170, subd. (b)(2).)[4]

### 2. Applicable Law and Analysis

Defendant contends that because his case is not yet final on appeal, he is entitled to the benefits of sections 654 and 1170, as amended, pursuant to the principles of retroactivity set forth in *In re Estrada* (1965) 63 Cal.2d 740. The People agree that we should remand the matter for resentencing and permit the trial court to reconsider its sentencing choices in light of the recent amendments. We agree.

The Supreme Court has held, when a court is unaware of the scope of its discretionary powers, "the appropriate remedy is to remand for resentencing unless the record 'clearly indicate[s]' that the trial court would have reached the same conclusion 'even if it had been aware that it had such discretion.' " (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391.) After reviewing the trial court's comments and sentence in this case, we are unable to conclude that the trial court would not exercise its discretion to impose a different sentence and will remand for resentencing.

---

[4]  Section 1170, subdivision (b)(3) provides that the trial court may also rely on a certified record of a defendant's prior convictions in determining the sentence to impose without submitting the prior convictions to the jury.

### B.     *Defendant's Conduct Credits, Section 4019*

#### 1.     Background

On December 26, 2017, the trial court found defendant incompetent to stand trial and suspended criminal proceedings. The trial court committed defendant to the state hospital for treatment on January 24, 2018. Thereafter, on January 9, 2019, the trial court found defendant competent to stand trial. At sentencing, the trial court awarded defendant 645 days of custody credits and 96 days of conduct credits.[5]

#### 2.     Law

Effective January 1, 2019, Senate Bill No. 1187 (2017–2018 Reg. Sess.) amended section 1375.5 and former section 4019 to authorize conduct credits for persons receiving treatment in county jail facilities. (Stats. 2018, ch. 1008, §§ 4–5.) Section 1375.5, subdivision (c) stated that "[a] person subject to this chapter shall receive credits pursuant to Section 4019 for all time during which he or she is confined in a county jail and for which he or she is otherwise eligible." (Stats. 2018, ch. 1008, § 4.) Former section 4019 matched these changes by defining a new eligibility category for presentence conduct credits as set forth in subdivision (a)(8): "When a prisoner is confined in or committed to a county jail treatment facility, as defined in Section 1369.1 …." (Stats. 2018, ch. 1008, § 5.) The amendments to sections 1375.5 and 4019 made no changes with respect to persons receiving treatment in a state hospital facility.[6]

Effective January 1, 2022, Senate Bill No. 317 (2021–2022 Reg. Sess.) amended section 4019, subdivision (a)(8), to permit the award of conduct credits for time a defendant spends in the state hospital having his competency restored. (Stats. 2021,

---

[5]     The probation officer's report indicated that defendant had been incarcerated at Kern County jail since his arrest on October 17, 2017, through the date of his sentencing on July 23, 2019. As such, it appears defendant was awarded conduct credits based upon the entire time he was in custody without regard to the time he spent in the state hospital having his competency restored between January 24, 2018, and January 9, 2019.

[6]     Defendant spent approximately nine days in the state hospital after the 2019 amendment to section 4019 went into effect.

ch. 599, § 3.) The People, in its opening brief on remand, argue for the first time that the trial court erroneously awarded conduct credits for time spent in the state hospital because former section 4019 did not permit defendants at state hospitals to earn conduct credits. The People argue that we should remand the matter so the trial court can recalculate defendant's conducts. In addition, the People argue that upon remand, Senate Bill No. 317's amendment to section 4019 should not be applied retroactively by the trial court.

### 3. Analysis

We decline to reach these legal arguments as the issue of defendant's entitlement to conduct credits for time spent in the state hospital is not properly before us. Defendant did not raise the issue in his appeal, most likely because he had received such credit. The People did not raise the issue until after the matter was remanded to us from the Supreme Court. Because we are remanding for resentencing on other grounds, we need not address the parties' arguments regarding the proper application of section 4019. At resentencing, the parties may address the issue with the trial court. (*People v. Slayton* (2001) 26 Cal.4th 1076, 1084 ["As a general rule, we do not issue advisory opinions indicating ' "what the law would be upon a hypothetical state of facts." ' "]; *Pacific Legal Foundation v. California Coastal Com.* (1982) 33 Cal.3d 158, 170 [ripeness doctrine "is rooted in the fundamental concept that the proper role of the judiciary does not extend to the resolution of abstract differences of legal opinion. It is in part designed to regulate the workload of courts by preventing judicial consideration of lawsuits that seek only to obtain general guidance, rather than to resolve specific legal disputes"]; see *People v. Chadd* (1981) 28 Cal.3d 739, 746 ["We will not ... adjudicate hypothetical claims or render purely advisory opinions."], overruled on other grounds in *Cowan v. Superior Court* (1996) 14 Cal.4th 367, 374.)

**III.**      *Other sentencing errors.*

Defendant argues that the abstract of judgment erroneously reflects a $30 criminal conviction assessment (Gov. Code, § 70373) as to count 4 that the trial court did not impose orally. Defendant and the People agree that the abstract of judgment should include, but does not, the components of the $930 penalty assessment as to count 1.[7] In light of our remand for resentencing, we need not address these issues.

## DISPOSITION

The sentence is vacated, and the matter is remanded to the trial court to resentence defendant under section 1170, as amended by Senate Bill No. 567 (Stats. 2021, ch. 731, § 1.3) and section 654, as amended by Assembly Bill No. 518 (Stats. 2021, ch. 441, § 1). The clerk of the court is instructed to ensure that the minutes and abstract of judgment reflect the components of any penalty assessed. The judgment is otherwise affirmed.

HILL, P. J.

WE CONCUR:

POOCHIGIAN, J.

SMITH, J.

---

[7]      Upon remand, the minutes and abstract of judgment should reflect the components of any penalty assessments imposed. (*People v. Hamed* (2013) 221 Cal.App.4th 928, 937, citing *People v. High* (2004) 119 Cal.App.4th 1192, 1200–1201.) After oral pronouncement of the sentence occurs, "[t]he responsibility then falls to the trial court clerk to specify the penalties and surcharge in appropriate amounts in the minutes and, more importantly, the abstract of judgment." (*People v. Sharret* (2011) 191 Cal.App.4th 859, 864; see *People v. Voit* (2011) 200 Cal.App.4th 1353, 1373.)